**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| _____ )<br><br>**KYNDRA K. ROTUNDA** )<br> )<br>        **Plaintiff,** )<br> )<br>   **v.** )<br> )<br>**JOSEPH C. ZENGERLE, in his personal capacity,** )<br>**DANIEL D. POLSBY, in his personal capacity, and** )<br>**THE RECTOR AND VISITORS OF GEORGE** )<br>**MASON UNIVERSITY,** )<br> )<br>        **Defendants.** )<br>_____) | **CIVIL ACTION NO.**<br><br>**1:09-CV-0752 LMB/TRJ** |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANT DANIEL D. POLSBY'S**
**MOTION FOR SUMMARY JUDGMENT**

R. Mark Dare
Virginia Bar No. 14146
*Attorney for Daniel D. Polsby*
Isler Dare Ray Radcliffe & Connolly, P.C.
1919 Gallows Road, Suite 320
Vienna, Virginia 22182
Phone:  (703) 748-2690
Facsimile:  (703) 748-2695
mdare@islerdare.com

Mark E. Papadopoulos
Virginia Bar No. 77508
*Attorney for Daniel D. Polsby*
Isler Dare Ray Radcliffe & Connolly, P.C.
1919 Gallows Road, Suite 320
Vienna, Virginia 22182
Phone:  (703) 748-2690
Facsimile:  (703) 748-2695
mpapadopoulos@islerdare.com

# **TABLE OF CONTENTS**

I.   ARGUMENT ..........................................................................................................1

    A.   The Doctrine of Qualified Immunity Shields Polsby From Liability For His Reasonable Discretionary Acts. ..............................................................................2

    B.   Claim Of Supervisory Liability Under Section 1983 Against Polsby For Failure To Prevent Alleged Sexual Harassment By Zengerle Fails....................................4

        1.   Plaintiff Cannot Establish The Elements Of Section 1983 Supervisory Liability For Sexual Harassment Or Sex Discrimination ...........................4

        2.   Qualified Immunity Protects Polsby From Liability .................................12

    C.   Plaintiff Fails To Establish A Claim For Pay Discrimination Under The Equal Protection Clause Of The Fourteenth Amendment And Section 1983 As Zengerle And Plaintiff Are Not Similarly Experienced Or Situated In Any Way ...............13

    D.   Plaintiff Cannot Maintain A Claim Against Polsby For Constructive Discharge Under the Equal Protection Clause .......................................................................16

        1.   No Equal Protection Constructive Discharge Claim.....................................16

        2.   No Constructive Discharge Claim Against Polsby Under Any Standard. ....17

        3.   Qualified Immunity Protects Polsby ..........................................................18

    E.   There Is No Cause Of Action For Retaliation Under The Equal Protection Clause Of The Fourteenth Amendment And Section 1983, And Plaintiff Cannot Maintain Such A Claim On Any Other Basis......................................................................19

        1.   There Is No Cause Of Action For Equal Protection Retaliation...................19

        2.   Plaintiff Cannot Maintain A First Amendment Retaliation Claim Against Polsby.. ......................................................................................................20

        3.   Plaintiff Cannot Establish A Claim Of Retaliation Against Polsby Under Any Standard Of Law. .................................................................................21

    F.   Plaintiff Cannot Meet The Standard For Recovery Of Punitive Damages............22

# I.   <u>ARGUMENT</u>

Plaintiff alleges in this action that Polsby deprived her of her constitutional rights under color of state law by intentionally discriminating against her in terms of pay and, indirectly, by failing to stop Zengerle's alleged harassment of her, culminating in a written reprimand and a constructive discharge.   Specifically, Plaintiff alleges four causes of action under section 1983 against Polsby:   (1) sexual harassment and/or sex discrimination under the Equal Protection Clause of the Fourteenth Amendment for failure to stop Zengerle's sexual harassment of Plaintiff; (2) pay discrimination under the Equal Protection Clause of the Fourteenth Amendment for paying Plaintiff less as Director of the Clinic than Zengerle; (3) constructive discharge under the Equal Protection Clause of the Fourteenth Amendment; and (4) retaliation under the Equal Protection Clause of the Fourteenth Amendment for allowing Zengerle to reprimand her in response to her protected activity.

The undisputed facts contradict these claims.   Summary judgment must therefore be awarded to Polsby.   Notwithstanding an extreme amount of discovery by Plaintiff, she has produced scant evidence to support her claims.   This is particularly damaging to her claims against Polsby because she asserts only one count against Polsby based on his own affirmative acts (the pay discrimination claim).   Plaintiff's other three counts against Polsby all rely upon a theory of supervisor liability, holding him responsible for the acts of his subordinate Zengerle.   Thus, Plaintiff must present evidence not only of an underlying violation of her constitutional rights by Zengerle but also of deliberate indifference by Polsby to these constitutional injuries.   Moreover, even if Plaintiff could meet this high standard, qualified immunity exists to protect public officials for their discretionary decision-making in employment matters like this one unless a reasonable official would have clearly known that Zengerle's treatment of Plaintiff was plainly unconstitutional sex discrimination.   It was not.   As the Office of Equity and Diversity Services itself found no gender

discrimination after a full investigation, discrimination was certainly not obvious, if it existed at all. Polsby is entitled to summary judgment on grounds of qualified immunity on all four counts.

## A.   The Doctrine Of Qualified Immunity Shields Polsby From Liability For His Reasonable Discretionary Acts.

Daniel D. Polsby ("Polsby"), as Dean of the George Mason University Law School, is a public official entitled to qualified immunity for his discretionary acts unless they are palpably unlawful.[1]  Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

In assessing a qualified immunity defense, courts apply a two step-process:  "First, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right.  Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* at 816.  An official is immune from liability "unless the official's conduct violated a clearly established constitutional right."  *Id.; see also Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001) ("Qualified immunity shields government officials from civil liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

---

[1] While the qualified immunity issue arises only to the extent that Plaintiff is able to establish any of the alleged underlying constitutional violations, qualified immunity is a separate and distinct doctrine that protects Polsby equally from all four constitutional claims below and should be considered separately.

"To determine whether a federal right was clearly established at the time of defendants' alleged conduct, [courts] focus not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Zepp v. Rehrmann*, 79 F.3d 381, 385 (4th Cir. 1996); *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir. 1988) ("At the more specific level here at issue–a warrantless arrest by a police officer–the test is whether a police officer acting *under the circumstances at issue* reasonably could have believed that he had probable cause to arrest, i.e., to believe that the arrestee was committing or had committed a criminal offense.") (emphasis added).   That is, it must be plain to the decision-maker that his actions violate the Constitution not in the abstract sense such as whether the Constitution protects against "unreasonable searches and seizures"—of course it does—but whether for example it is "unreasonable for a police officer in April 1992 to have believed that bringing media observers along during the execution of an arrest warrant (even in a home) was lawful." *Wilson v. Layne*, 526 U.S. 603, 614 (1999).   "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

Plaintiff must therefore not only identify a specific constitutional right violated by Polsby but also demonstrate that this right was so clearly established that it would be obvious to a reasonable public official that his conduct was violating the law.   This is the exception and not the rule:   "When state officials are sued in their individual capacities, the application of qualified immunity to their actions is the rule rather than the exception, and only in exceptional cases will government actors have no shield against claims made against them in their individual capacities." *Braddy v. Florida Dept. of Labor and Empl. Sec.*, 133 F.3d 797, 801 (11th Cir. 1998).   "The tolerance thus accorded by the qualified immunity defense to good faith mistakes of judgment . . . is deliberately designed to give protection to all but the plainly incompetent or

those who knowingly violate the law, in order to avoid undue inhibitions in the performance of official duties." *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).

**B.**     **Claim Of Supervisory Liability Under Section 1983 Against Polsby For Failure To Prevent Alleged Sexual Harassment By Zengerle Fails.**

Plaintiff's central claim against Polsby is that he violated the Equal Protection Clause by failing to prevent Zengerle from discriminating against her.   Compl. ¶ 222-229; (Plaintiff ("Pl.") Dep. at 357-371).   Plaintiff has not suggested that Polsby personally participated in the alleged harassment or made any inappropriate or discriminatory comments himself.   Rather, this is a constitutional claim purely based on supervisory liability.   Plaintiff's claim fails.[2]

**1.**     **Plaintiff Cannot Establish The Elements Of Section 1983 Supervisory Liability For Sexual Harassment Or Sex Discrimination.**

Section 1983 provides a cause of action for individuals who have been deprived of their constitutional rights under color of state law.   *See* 42 U.S.C. § 1983.   Section 1983 does not impose *respondeat superior* liability upon supervisory officials for the misconduct of their subordinates.   *See Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (supervisor liability "is not based on ordinary principles of *respondeat superior*[.]").   "[A] law officer may incur § 1983 liability only through affirmative misconduct."   *Randall v. Prince George's County*, 302 F.3d 188, 202 (4th Cir. 2002).

To hold a supervisor liable under section 1983 for the constitutional injuries caused by subordinates, a plaintiff must plead and prove three elements: "(1)  that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive

---

[2]  Plaintiff pleads two additional counts under the Equal Protection Clause (retaliation and constructive discharge)—discussed at greater length in Sections I(D) and I(E)—that have no basis in the law and should be dismissed.   In the alternative, these two claims could be considered in this Section simply as evidence of her Equal Protection sex discrimination argument that Polsby failed to stop Zengerle's harassment and discrimination even after she filed a complaint and ultimately resulting in her constructive discharge.   As such, the claims should be dismissed for the reasons set forth in this Section I(B).

and unreasonable risk of constitutional injury to citizens like the plaintiff;   (2)   that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3)   that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

This standard is a high one.  "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799.  Moreover, a supervisor with knowledge of this risk must then "show continued inaction in the face of documented widespread abuses." *Mikkelsen v. DeWitt*, 141 Fed. Appx. 88, 92, 2005 WL 1655026 at *3 (4th Cir. July 15, 2005).

Plaintiff must prove that Polsby's conduct in responding to her complaints was beyond merely negligent.  "Deliberate indifference is a very high standard–a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999).  "Under this standard, mere negligence is insufficient to establish supervisory liability." *Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999).  Actions that in hindsight are "unfortunate" or even "imprudent" will not suffice to meet this standard. *Jones v. Wellham*, 104 F.3d 620, 627 (4th Cir. 1997). Even a school principal who "misread the situation and made a tragic error in judgment" investigating a claim of sexual abuse cannot be held liable for supervisory liability. *Doe v. Dallas Ind. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998).

The dispositive inquiry here is not whether the complainant was satisfied by the supervisor's response or whether the supervisor reached the "right" result, but whether the response was at all reasonable.  In *Mikkelsen*, 141 Fed. Appx. at 89, a court security officer

5

(Addie Mikkelsen) brought a claim of supervisory liability against Sheriff Wayne DeWitt alleging that he failed to respond properly to her allegations of sexual harassment by her immediate supervisor Henry Broughton.  In response to her complaints, Sheriff DeWitt had immediately ordered the Director of Human Resources, an independent fact-finder, to conduct a prompt investigation of the matter, which she did.  *See id.* at 89.  The Human Resources Director concluded that some of Mikkelsen's claims were credible and some were not and, moreover, that Mikkelsen herself had engaged in misconduct.  *See id.* at 90.  As a result of these findings, DeWitt sent separate letters to both Mikkelsen and Broughton notifying each of the findings and asking that they resign or face termination.  *See id.*  Although the victim of harassment herself was terminated, the Fourth Circuit found this supervisory response to be "rapid, reasonable, and appropriate" even though she strongly disputed the findings against her and indeed claimed it was nothing more than an attempt to shift the focus away from the harassment.  *See id.*  The court noted: "*regardless of the ultimate fallout from the investigation*, it is hard to accept Mikkelsen's contention that DeWitt does not permit sexual harassment complaints to be investigated when his actions here do not fit that pattern at all."  *Id.* at *4 (emphasis added).

A brief recitation of the facts of Plaintiff's workplace complaints against Zengerle and Polsby's responses thereto demonstrates that there is no genuine issue of material fact as to whether Polsby was *deliberately indifferent* to a known risk of constitutional injury.  Polsby was first made aware of workplace conflict between Plaintiff and Zengerle in December 2006 when Vice Dean Nelson Lund communicated to Polsby concerns that Plaintiff had with Zengerle's management of the Clinic for Legal Assistance to Servicemembers (the "Clinic").  The essence of her complaints, as relayed to Polsby by Lund, was that she found Zengerle "terminally annoying."  (Polsby Dep. 199).  Polsby's response was to tell Zengerle that he needed to give

Plaintiff more latitude in the running of the Clinic on a day to day basis.  (Lund Dep. 57-58; Zengerle Dep. 236).  When Plaintiff raised additional concerns, Polsby met with her alone on April 23, 2007 to hear her out.  (Polsby Dep. 316; Pl. Dep. Ex. 27).  At this meeting, she leveled additional criticisms at Zengerle but did not say anything about sexual harassment or discrimination.  (Pl. Dep. Ex. 27; Polsby Dep. 194-198).   Polsby decided that further discussion was needed and convened a meeting two days later involving both Zengerle and Plaintiff (as well as Lund and Associate Dean Nields) in an attempt to improve the lines of communication between the parties.  (Nields Dep. 24-34).  After the April 25 meeting, Zengerle apologized to Plaintiff and both parties said they were committed to making the relationship work.  (Zengerle Dep. Ex. 51).  When Associate Dean Nields offered to review Plaintiff's diary of her complaints against Zengerle, Plaintiff demurred because she had "aired [her] concerns" with Zengerle and was willing "to move forward."  There was "no need for the University to take further action." (Pl. Dep. 112-15; Polsby Dep. 240-243).   To improve their communication, Plaintiff and Zengerle agreed to have periodic lunches together.  (Pl. Dep. 420-421 and Ex. 44).

The relationship did seem to improve for a time, but in June 2007, Plaintiff sent an email to Zengerle, copying Nields and Associate Dean Craig Lerner, stating that Zengerle's "future communications" with her had to be "in writing."  (Pl. Dep. Ex. 2).  A meeting was scheduled between Plaintiff, Associate Dean Lerner, and Nields on June 7, 2007, but was then canceled by Nields and referred to GMU's Office of Equity and Diversity Service after Plaintiff used the term "severe and pervasive harassment" in a phone call with Nields and in an email to Lerner. (Lerner Dep. Ex. 2; Pl. Dep. Ex. 53).  GMU officials properly instructed Plaintiff that she should file a formal complaint of discrimination with the Office of Equity and Diversity Services because it is the independent body at the school charged with investigating such claims of

7

discrimination and harassment.  (Evola Dep. 160-161; Nields Dep. 65-66).  After Plaintiff filed her formal complaint on June 13, 2007, Polsby reasonably deferred to this independent investigation.  During this time Zengerle was required to work from home and relinquish the key to Plaintiff's office.  (Zengerle Dep. 275).  The Office of Equity and Diversity Services issued its findings on June 26, 2007.  (Evola Dep. Ex. 38).  The report did not find evidence of gender discrimination in Zengerle's treatment of Plaintiff but did acknowledge a "severe conflict between the parties" in which "communication has totally shut down" and thus recommended a mediation session between the parties conducted with a representative of the employee relations division, Deputy Director of Human Resources Pat Donini.  (Evola Dep. 38).

When Plaintiff resisted the mediation, Polsby directed Plaintiff and Zengerle to participate.  (Pl. Dep. 381-82, 385 and Ex. 37; Zengerle Dep. 270).  The mediation session occurred on July 18, 2007, and concluded with an agreement to meet again the following week to continue to work through differences.  (Polsby Dep. Ex. 54; Nields Dep. 75-76; Pl. Dep. Ex. 61).  When the mediator Pat Donini attempted to schedule that second mediation, however, Plaintiff told her that she was on leave and could not participate.   (Polsby Dep. Ex. 54; Nields Dep. 75-76; Pl. Dep. Ex. 61).  Plaintiff and Zengerle did meet again in late July, with Nields present, to discuss Clinic matters so that the Clinic could continue to function, and at this time Plaintiff agreed to send the Clinic grades for the summer semester to Zengerle before submitting them to the Registrar's Office.  (Pl. Dep. 52-53 and Ex. 5).  Plaintiff instead submitted the grades without sending them to Zengerle, and Zengerle subsequently issued Plaintiff a written reprimand for deliberate insubordination.   (R. Rotunda Dep. 209; Nields Dep. 260-261; Zengerle Dep. 265; Polsby Dep. Ex. 21; Jones Decl. Exs. 6-7).

While Plaintiff now criticizes the Office of Equity and Diversity Services procedures as not only inadequate but also inconsistent with the University's own policy, she did not do so until the Office handed down an unfavorable decision.  In any event, there is no basis for asserting that Polsby, by deferring to that office, did not take the allegations seriously.  The very rationale for establishing an Office of Equity and Diversity Services is to have an independent and credible fact-finding body that can investigate claims of discrimination impartially and removed from the operating divisions of the University.  (Polsby Dep. 250-252).  The Office of Equity and Diversity Services is staffed by trained EEO professionals who monitor every aspect of GMU's diversity and discrimination policies.  (Evola Dep. 36).  Part of this mission is to formally and independently investigate claims of discrimination made by school employees or students.  (Nields 30(b)(6) Dep. 306; Jackson Dep. 416-418; Polsby Dep. 249-252).  The investigation in this case was conducted by Josie Evola, a senior investigator in the Office of Equity and Diversity Services. [3]  (Pl. Dep. Ex. 45; Evola Dep. 99 and Ex. 29). Specifically, her investigation involved interviewing Plaintiff and Zengerle as well as witnesses Ronald Rotunda, Lund, Nields, Polsby, Sandi Bowen (the secretary assigned to the Clinic), Heather Bailey, another GMU employee, and several students.  (Evola Dep. Exs. 21-23, 25-36); Evola also reviewed the documentation submitted by Plaintiff.  (Evola Dep. 78-80).

Contrary to Plaintiff's current claims of deficiencies in this investigation, Plaintiff's own expert witness admitted that someone like Polsby who is "not in human resources" would not have understood the Office of Equity and Diversity Services investigation and the report to be flawed.  (Weinstein Dep. 113).  Moreover, while Plaintiff also contends that Polsby and GMU

---

[3] Ms. Evola is a law school graduate with many years of experience for two different universities in the equal opportunity field.  (Evola Dep. 17-24).  She has worked on diversity and affirmative action issues and attended EEOC conferences as a member of the American Association of Affirmative Action Officers.  (Evola Dep. 17-20).

intentionally disregarded the correct procedures for investigation and resolution of claims of discrimination, s*ee* Compl. ¶¶ 85-89; (Pl. Dep. 371-380), she offers no evidence that this is true or was within Polsby's control, let alone something he directed.  The Office did in fact follow the correct investigation procedures in place in the summer of 2007 (Jackson Dep. 407), and Polsby would not have had the authority to change the procedures anyway.  (Polsby Dep. 248).  Indeed, had Polsby involved himself in the investigation, Plaintiff would surely now contend that he micro-managed the investigation and results.  GMU's process represents a thoroughly reasonable policy and Plaintiff has identified nothing material that is defective about it or how Polsby would have been able to change it.  Plaintiff ultimately disagrees with the findings of the determination report, but there is no evidence in the record that Polsby's deference to this process was somehow a sham or the result foreordained.

The cases in this Circuit that have found the elements of supervisory liability present are therefore not remotely similar to this one.  First, *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001) involved a school principal's failure to respond to qualitatively different allegations that a teacher (Lawson) was molesting his minor students.  The principal (Malone) had personally been informed in 1990 by a former student of Lawson's that he had been molested by Lawson.  *See id.* at 233.  This was confirmed by the student's mother.  *See id.*  In response, Malone did nothing. *See id.*  Later that Fall, the school librarian also raised concerns with Malone about Lawson's conduct toward a new student (Baynard) at which time Malone did nothing more than speak with Lawson, who convinced her that the interaction with the student—including physical contact— was innocent.  *See id.*  The behavior engaged in by Lawson was not in fact innocent, and he was eventually caught, prosecuted, and imprisoned.  *See id.* at 234.  In contrast to the present case, this was not a "gray area" involving workplace conflict between adults that—while unpleasant to

10

the parties involved—is not obviously gender based or discriminatory.  These were credible allegations of extremely serious criminal conduct that placed all of Lawson's students at risk of sexual abuse and, even after multiple reports, the principal did nothing more than talk to the alleged offender.

The case of *Jennings v. University of North Carolina*, 482 F.3d 686, 701-02 (4th Cir. 2007) is similarly inapposite.  There, the Fourth Circuit reversed the grant of summary judgment for the Assistant to the Chancellor of the University (Ehringhaus) on claims of section 1983 supervisory liability by a former soccer player (Jennings) who alleged the University soccer coach Anson Dorrance sexually harassed her and others on the team.  Jennings met with Ehringhaus and another official and provided "vivid details" of Coach Dorrance's constant and explicit sexual banter, questions directed at her and others, and innuendo.  *Id.* at 700.  In response, "Ehringhaus dismissed this complaint by telling Jennings that Dorrance was a 'great guy' and that she should work out her problems directly with him.  Ehringhaus took no action on the complaint, and Dorrance's harassment continued."  *Id.* at 701.  The Fourth Circuit described this official response as a "failure to take any action that would remedy the situation[.]" *Id.* Thus, the Court found that a reasonable factfinder could regard this response as "deliberately indifferent."[4]

The school's official response in *Jennings* bears no similarity to the process that Plaintiff was afforded in this case, which included two meetings with University officials, including Polsby, in April 2007 to be heard and to try to work out issues regarding management of the Clinic; numerous follow-up discussions with university officials about the Clinic and Zengerle; a formal investigation by the Office of Equity Services in which the investigator interviewed

---

[4] Even in that case, the Fourth Circuit made no finding as to whether Ehringhaus was liable but rather remanded to the district court for a finding on the qualified immunity issue.

multiple witnesses and collected documents; a determination report of detailed findings; and a follow-up session with a trained mediator who attempted to schedule another session. Plaintiff may not like the ultimate results of this process, but that is not the point. It is often the case that one party or another will disagree with the results. The point is whether Polsby was deliberately indifferent, and the facts in evidence demonstrate that he was not.

**2.      Qualified Immunity Protects Polsby From Liability.**

Assuming *arguendeo* that Plaintiff could establish the elements of supervisory liability under section 1983 here, a government official like Polsby is still immune "from liability for civil damages insofar as the conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. at 815. If a constitutional violation occurred, it occurred solely on the basis of his supervisory responsibilities for failure to adequately direct and control Zengerle's behavior. This is the same behavior by Zengerle that the Office of Equity and Diversity Services, after a full investigation, determined was not gender discrimination. (Evola Dep. Ex. 38). At the very least, Zengerle's conduct was not clearly sexual or discriminatory on its face. As such, Polsby was exercising supervisory responsibilities in the very "gray areas" of discretionary decision-making that this Circuit has held are protected from liability under qualified immunity: "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello*, 973 F.2d at 298. Polsby's behavior in fact was much better than a bad "guess"; it was a reasonable and diligent attempt to deal with a difficult workplace dispute between two law professors.

While the constitutional right to be free from sex discrimination as a general matter is well established and not in dispute, the specific question still remains whether in this case Polsby should have known specifically that "his conduct was unlawful in the situation he confronted."

12

*Saucier v. Katz*, 533 U.S. 194, 202 (2002).  This is a particularly critical question in "sexual harassment" cases where the Fourth Circuit has recognized that "the line between a merely unpleasant working environment and a hostile or deeply repugnant one may be difficult to discern." *Hopkins v. Baltimore Gas & Elec. Co.,* 77 F.3d 745, 754 (4th Cir. 1996).  Where a case does not involve "overt sexual propositions or touching," a "court cannot conclude that [a defendant] violated a clearly established right of which a reasonable person would be aware." *Briggs v. Waters*, 455 F. Supp. 2d 508, 520 (E.D. Va. 2006).  Indeed, courts have found that qualified immunity attaches in situations where a supervisor's conduct in responding to allegations of sexual harassment was much less diligent than in this case.  *See*, *e.g.*, *Braddy v. Florida Dep't of Labor and Employment Security*, 133 F.3d 797 (11th Cir. 1998) (supervisory official took certain actions to stop the harassment but never completely stopped it:  "Certainly Davis could have done more to discipline Lynch, but the question is whether her response to the situation was constitutionally inadequate.").

Applied to this case, there is no question that Zengerle's actions did not cross any bright line of sexual harassment such that Polsby would reasonably have known that his failure to stop the harassment would itself violate the Constitution.  Indeed, even in *Jennings*, where the court found a triable issue on the supervisory liability question for the school official's failure to take *any* action to even investigate the soccer coach's harassment of his players, the Fourth Circuit nonetheless remanded on the issue of qualified immunity, as the district court had not ruled on that issue.  *See Jennings*, 482 F.3d at 702.  That is, even presented with the volume of evidence in that case, the public official might still have been entitled to qualified immunity.

13

**C.** **Plaintiff Fails To Establish A Claim For Pay Discrimination Under The Equal Protection Clause Of The Fourteenth Amendment And Section 1983.**

Plaintiff's allegation of constitutional pay discrimination falls short on its face.  Plaintiff claims that Defendant Zengerle "performed no significant duties other than those listed in the June 23, 2006 job posting" that Plaintiff performed from 2006 - 2007.  Compl. ¶ 109.  Based on this fact and her own subjective assessment of Zengerle's teaching methods and responsibilities, Plaintiff deduces that Polsby intentionally determined "the pay rate for plaintiff Rotunda at a rate less than the rate paid to defendant Zengerle, because of her sex."  Compl. ¶ 221.

To succeed on an equal protection claim, "a plaintiff must show at the outset that: (i) he was treated differently from others (ii) who were similarly situated and (iii) that such unequal treatment was the result of intentional or purposeful discrimination."  *Blagman v. White*, 112 F. Supp. 2d 534, 538 (E.D. Va. 2000).[5]  Plaintiff fails even to meet this prima facie test.

As a threshold matter, Plaintiff's claim fails because she cannot establish that Polsby intentionally discriminated against her based on sex when the salary range for the Clinic Director position was established before the applicants were interviewed and the gender of the new Clinic Director was even known.  (Polsby Dep. 185; Nields Dep. 30(b)(6) Ex. 15).  Moreover, the salary level was driven primarily by the funding available to the Clinic at that time (not by Polsby), as the position was to be funded completely out of the Clinic's budget.  (Polsby Dep. 185; Polsby Dep. Ex. 11).  Therefore, it is impossible that there was "intentional discrimination" based on sex in setting the rate of pay.  This alone is sufficient to dismiss this claim.

In any event, Plaintiff was not similarly situated to Zengerle.  The job posting she relies upon states that salary will be set "commensurate with education and experience."  (Polsby Dep.

---

[5]  This Circuit and others have held that the elements of proof in a section 1983 discrimination claim mirror those of a Title VII claim, and thus Title VII case law is also instructive.  *See*, *e.g*, *Worster v. U.S. Postal Service*, 28 Fed. Appx. 324, 327 (4th Cir. 2002).

Ex. 13).   Plaintiff cannot dispute that experience plainly is a factor in determining someone's compensation.   The experience levels of the two are not remotely comparable.   At the time of her hire by GMU as Director of the Clinic, Plaintiff was unemployed and had been out of law school for only seven years with an employment history that included stints working for the Governor of Wyoming, in the Judge Advocate General Corps, and as an associate at a large law firm for a couple of months.   (Polsby Decl. Ex. 1; Pl. Dep. 35-36).   She had never taught law school students previously in a clinic setting or otherwise.   (Polsby Decl. Ex. 1).   Professor Zengerle, in contrast, is a 1964 graduate of West Point who became an Airborne Ranger and Infantry officer.   (Polsby Dep. Ex. 47).   He served in Vietnam in 1968 as a special security assistant to General William Westmoreland during the Tet Offensive, later commanding his own unit, where he received the Bronze Star.   (Polsby Dep. Ex. 47).   Professor Zengerle graduated from the University of Michigan Law School in 1971, *magna cum laude*, clerked for Judge Carl McGowan on the U.S Court of Appeals for the D.C. Circuit and for Chief Justice Warren Burger, served as an assistant secretary of the Air Force (Manpower, Reserve Affairs and Installations) under President Carter, and co-founded the Washington office of the law firm now known as Bingham McCutcheon.   (Polsby Dep. Ex. 47).   After twenty years of private practice in Washington, Professor Zengerle became executive director of the Legal Aid Society of D.C for five years.   (Polsby Dep. Ex. 47).   Following the terrorist attacks of September 11, Professor Zengerle developed and taught a seminar on Homeland Security and the War on Terror at George Mason law school (2002-04).   (Polsby Dep. Ex. 47).   Professor Zengerle founded the Clinic for Legal Assistance to Servicemembers in 2004.   (Polsby Dep. Ex. 47).

Moreover, while the recitation of the comparative legal experience of Plaintiff and Professor Zengerle should dispel any doubts that there was no constitutional violation in setting

15

different pay rates for attorneys of vastly different ranges and levels of experience, the facts are also undisputed that Zengerle's duties have always been different and more onerous than Plaintiff's duties as Director of the Clinic from 2006 - 2007.  Zengerle founded the Clinic, set up the structure and network of supervising attorneys, and was responsible for its continued existence at all times.  (Polsby Dep. Ex. 57).  Critically, he met with Department of Defense officials and helped secure appropriations to fund the Clinic.  (Polsby Dep. Ex. 57).  He interacted with Congress, administrative agencies and other relevant outside bodies to support and grow the Clinic.  (Polsby Dep. Ex. 57; Zengerle Dep. 433-435).  Plaintiff was hired to be his deputy and assist by running the day-to-day operations of the Clinic.  (Polsby Dep. Ex. 57; Zengerle Dep. 433-435).  Zengerle became Executive Director and retained ultimate authority over and responsibility for the Clinic.  (Polsby Dep. Ex. 57).  When Plaintiff resigned, Zengerle once again assumed all duties and responsibilities of the Clinic.  (Zengerle Dep. 127).[6]

**D.**     **Plaintiff Cannot Maintain A Claim Against Polsby For Constructive Discharge Under The Equal Protection Clause.**

**1.     No Equal Protection Constructive Discharge Claim.**

While Plaintiff pleads "constructive discharge" against Polsby under the Equal Protection Clause and section 1983 as a separate cause of action distinct from her sexual harassment Equal Protection claim, *see* Compl. ¶ 231, there is no case law to support this position.  Constructive discharge cases by public employees sound in Due Process, i.e., whether the employee was constructively discharged from her employment without an appropriate level of procedural fairness.  *See Dennison v. County of Frederick*, 921 F.2d 50, 55 (4th Cir. 1990) ("To establish a

---

[6]  If somehow this claim could be established, it is surely not the case for qualified immunity purposes that Polsby would have known that paying a more experienced law professor with greater responsibilities more money than a less experienced one with fewer responsibilities constitutes a violation of a clearly established constitutional right.

claim of constructive discharge," a public employee "must prove that he was in fact constructively discharged and that the County failed to provide adequate procedural due process as required by the fourteenth amendment."); *Stone v. University of Maryland Medical System*, 855 F.2d 167 (4th Cir.1988) (constitutional constructive discharge claims sound in due process).

Any due process claim fails here as Plaintiff was an at-will employee.[7]  Without any continued expectation of employment, she had no protectable property interest that was deprived without due process.  *See Jenkins v. Weatherholtz*, 909 F.2d 105, 107 (4th Cir. 1990) ("Property interests in continued employment are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits"); *see also Stone*, 855 F.2d at 172 ("in order to claim entitlement to the protections of the due process clause–either substantive or procedural–a plaintiff must first show that he has a constitutionally protected liberty or property" interest, and that he has been deprived of that protected interest by some form of state action[.]").[8]

### 2. No Constructive Discharge Claim Against Polsby Under Any Standard.

The constructive discharge claim is therefore, at best, an extension of her Equal Protection supervisory liability claim against Polsby for failure to prevent Zengerle's alleged harassment that eventually resulted in her "constructive" discharge.  The claim can be dismissed

---

[7] (Polsby Dep. Ex. 39) ("appointment will be full-time, in accordance with Section III . . . of Administrative/Faculty Handbook" which states "Administrative/professional appointments are classified as at-will"); *see also County of Giles v. Wines*, 262 Va. 68, 72, 546 S.E.2d 721, 723 (Va. 2001) ("In Virginia, an employment relationship is presumed to be at-will").

[8]  In any event, Plaintiff attended multiple meetings with University officials, filed a complaint with the Office of Equity and Diversity Services that was investigated to conclusion, and attended a follow-up mediation session.  This is more than sufficient "process" to defeat a constructive discharge Due Process claim. *See Dennison*, 921 F.2d at 55 (one meeting with opportunity to be heard is sufficient process).

for the reasons stated in Section I(B) because there is no underlying injury, and Polsby was not deliberately indifferent to the risk of constitutional injury in any way.

Under Title VII, a constructive discharge only occurs where "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985).  "Deliberateness" exists only if actions complained of "were intended by the employer as an effort to force the employee to quit." *Id.* at 1255.  "To act deliberately, of course, requires intent.  Our decisions require proof of the employer's specific intent to force an employee to leave[,] [which] may be inferred through circumstantial evidence, including a failure to act in the face of known intolerable conditions." *Id.*  Indeed, a constructive discharge claim requires a workplace environment that is more hostile than the "severe and pervasive" standard required for a hostile work environment claim.  *See Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) ("Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim. To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.").  Thus, Plaintiff must show that Polsby individually harassed and discriminated against her at a level greater than "severe and pervasive" in order to force her quit.  The evidence does not remotely support this conclusion.[9]

### 3.  Qualified Immunity Protects Polsby.

As a final matter, even if Plaintiff could make out a cognizable claim here, qualified immunity would still attach.  Surely the law was not clear to a public official like Polsby that his

---

[9] Even if she could make out a claim of constructive discharge, she would need to establish a basis for imputing liability to Polsby, and Plaintiff cannot show Polsby was deliberately indifferent to her working conditions. *See* Section I(B).

conduct in reasonably deferring to the Office of Equity and Diversity Services investigation (including the determination report and recommended mediation session) while fulfilling his responsibilities as Dean by merely trying to get Plaintiff and Zengerle to at least meet and keep the Clinic operational, would somehow amount to a constitutional violation.  This was a law school Dean performing his job under difficult circumstances.

**E.**      **There Is No Cause Of Action For Retaliation Under The Equal Protection Clause Of The Fourteenth Amendment And Section 1983, And Plaintiff Cannot Maintain Such A Claim On Any Other Basis.**

Plaintiff alleges that Polsby retaliated against her in violation of the Equal Protection Clause.  Compl. ¶¶ 232-234.   There is no cause of action for retaliation under the Equal Protection Clause, and Plaintiff cannot maintain the count against Polsby.

**1.      There Is No Cause Of Action For Equal Protection Retaliation.**

It is well established in this Circuit that there is no Equal Protection claim for retaliation. "A generic retaliation claim . . . simply does not implicate the Equal Protection Clause." *Edwards v. City of Goldsboro*, 178 F.3d 231, 237 (4th Cir. 1999).   "The Claims based on the allegation that [the plaintiff] was treated differently in retaliation for his speech . . . do not implicate the Equal Protection Clause."    *Kirby v. City of Elizabeth City, North Carolina*, 338 F.3d 440, 447 (4th Cir. 2004); *see also Campbell v. Galloway*, 483 F.3d 258, 272 (4th Cir. 2007).

This is in accord with the vast body of law outside the Fourth Circuit that there is no cognizable Equal Protection claim for retaliation.  *See Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997) ("A pure or generic retaliation claim, however, simply does not implicate the Equal Protection Clause."); *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) ("[W]e know of no court that has recognized a claim under the equal protection clause for retaliation following complaints of racial discrimination."); *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*,

100 F.3d 1287, 1296 n. 8 (7th Cir. 1996) (Equal Protection Clause "does not establish a general right to be free from retaliation").

2.    **Plaintiff Cannot Maintain A First Amendment Retaliation Claim Against Polsby Under Section 1983.**

It is well recognized that a public employment claim of retaliation is viable if at all only as a First Amendment claim.  *See Campbell v. Galloway*, 483 F.3d 258, 265 (4th Cir. 2007) (retaliation against public employee for letter to chief of police complaining of sexual harassment raises First Amendment issues, not Fourteenth Amendment Equal Protection issues); *Mikkelsen v. DeWitt*, 141 Fed. Appx. 88, 92 (4th Cir. 2005) ("Mikkelsen next claims that DeWitt violated her First Amendment rights by firing her in retaliation for" complaining about the sexual harassment); *see also Thompson v. City of Starkville*, 901 F.2d 456, 468 (5th Cir. 1990); *Vukadinovich v. Bartels*, 853 F.2d 1387, 1391-92 (7th Cir. 1988).

Even had Plaintiff properly pleaded and prosecuted her retaliation claim under the First Amendment—which she has not—this claim would still fail because her complaints concerned a personal employment dispute and not a matter of public concern under the First Amendment. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community."  *Urofsky v. Gilmore*, 216 F.3d 401, 406-07 (4th Cir. 2000). Ordinary employment grievances are not matters of constitutional public importance under the First Amendment: "Personal grievances, *complaints about conditions of employment*, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee." *Stroman v. Colleton County School Dist.*, 981 F.2d 152, 156 (4th Cir. 1992) (emphasis added); *see also Dennison v. County of Frederick*, 921 F.2d 50, 54 (4th Cir. 1990) ("[P]ersonal grievances about working conditions do

20

not qualify as matters of public concern."). This is particularly true when the employee is merely complaining about his or her own workplace treatment. "The Fourth Circuit has recognized that it is settled that a public employee's expression of grievances concerning his own employment is not a matter of public concern." *Huang v. Bd. of Governors of the Univ. of North Carolina*, 902 F.2d 1134, 1140 (4th Cir.1990); *see also Campbell*, 483 F.3d at 267.

While Plaintiff might argue that allegations of sexual harassment against a law professor at a public university are inherently of public concern, this exception would swallow the rule because every public sector plaintiff could make this same argument in every commonplace claim of workplace discrimination. The Supreme Court considered and rejected this very position, reasoning that "government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 147 (1983). The Supreme Court further stated that to "presume that all matters which transpire within a government office are of public concern would mean that virtually every remark–and certainly every criticism directed at a public official–would plant the seed of a constitutional case." *Id.* Internal workplace complaints like this one are more immediately concerned with the employee than the public and are therefore not protected.

### 3.   Plaintiff Cannot Establish A Claim Of Retaliation Against Polsby Under Any Standard Of Law.

In the alternative, assuming for the sake of argument that the courts recognize a claim of retaliation under the Equal Protection Clause, Plaintiff could not make out a claim of retaliation against Polsby in any event. First, Plaintiff cannot make out a legal claim of retaliation against Zengerle and GMU. Second, if Plaintiff could establish some sort of constitutional retaliation claim against Zengerle or GMU, the only standard for holding Polsby liable as a public official for the acts of his subordinate is deliberate indifference. There has been no showing that Polsby

was somehow deliberately indifferent to Zengerle's supervision of Plaintiff in the summer of 2007 when Zengerle issued her a written reprimand for deliberately refusing Zengerle's instructions on the submission of grades, as she had also previously agreed to do. Polsby's involvement throughout the process after she filed her Office of Equity and Diversity Services complaint in June 2007 shows diligence—not indifference. It was Polsby who forwarded the additional complaint of discrimination in late July 2007 regarding the hallway brushing to the Office of Equity and Diversity Services to be investigated further. (Polsby Decl. Ex. 2).[10]

**F.**    **Plaintiff Cannot Meet The Standard For Recovery Of Punitive Damages.**

Plaintiff's prayer for relief includes a request for "punitive damages" against "defendant Polsby in his personal capacity." Compl. Prayer ¶ 11. In a section 1983 action, punitive damages may be awarded against individual officials only for "conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Smith v. Wade*, 461 U.S. 30, 46 (1983). There is no evidence in the record to support this claim for damages, and it should be dismissed.

Respectfully submitted,

_____/s/_____
R. Mark Dare
Virginia Bar No. 14146
*Attorney for Defendant Daniel D. Polsby*
Isler Dare Ray Radcliffe & Connolly, P.C.
1919 Gallows Road, Suite 320
Vienna, Virginia 22182
Phone:  (703) 748-2690
Facsimile:  (703) 748-2695
mdare@islerdare.com

---

[10] Even if Plaintiff were to establish an underlying constitutional violation that Polsby was individually liable for because of his failure to supervise, qualified immunity would protect Polsby because it is not clearly established law that retaliation is an Equal Protection violation such that Polsby would have known he was violating the law.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 26th day of April, 2010, I will file the foregoing Memorandum in Support of the Motion for Summary Judgment with the Clerk of Court using the Court's CM/ECF system, which will then send a notification of such filing (NEF) to the following:

R. Scott Oswald (VSB #41770)
soswald@employmentlawgroup.com
Adam Augustine Carter (VSB #32722)
acarter@employmentlawgroup.com
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Phone:  (202) 331-3911
Facsimile:  (202) 261-2835

*Attorneys for Plaintiff Kyndra Rotunda*

Phyllis A. Jones (Pro hac vice)
pajones@cov.com
Lindsay Buchanan (VSB # 72773)
lburke@cov.com
Jeffrey G. Huvelle
jhuvelle@cov.com
Covington & Burling LLP
1201 Pennsylvania Avenue NW
Washington, D.C. 20004-2401
Phone:  (202) 662-6000
Facsimile:  (202) 662-6291

*Attorneys for Defendant The Rector and Visitors of George Mason University*

Susanne Harris Carnell (VSB #41521)
scarnell@lorengercarnell.com
Michael J. Lorenger (VSB #38910)
mlorenger@lorengercarnell.com
651 S. Washington St.
Alexandria, Virginia 22314
Phone:  (703) 684-1800
Facsimile:  (703) 683-1805

23

*Attorneys for Defendant*
*Joseph H. Zengerle*

and by email to:

Richard T. Seymour (*Pro hac vice*)
rick@rickseymourlaw.net
Nellie A. Staker (*Pro hac vice*)
nellie@rickseymourlaw.net
Law Office of Richard T. Seymour, P.L.L.C.
1150 Connecticut Avenue N.W., Suite 900
Washington, D.C. 20036-4129
Phone:  (202) 862-4320
Facsimile:  (202) 828-4130

_____/s/_____
R. Mark Dare
Virginia Bar No. 14146
*Attorney for Defendant Daniel D. Polsby*
Isler Dare Ray Radcliffe & Connolly, P.C.
1919 Gallows Road, Suite 320
Vienna, Virginia 22182
Phone:  (703) 748-2690
Facsimile:  (703) 748-2695
mdare@islerdare.com

24